GONZALES, Judge.
Appellant, Johnny R. Stubbs, herein appeals a community property partition and makes the following assignments of error:
1. The trial court erred in classifying the DROP fund monies accumulated during the existence of the community as community property.
2. The trial court erred in failing to award appellee only 14.05% of the DROP fund monies accumulated during the existence of the community.
3. The trial court erred in its mathematical calculations of the portions of the “co-signer loan” attributable to appellant’s separate estate.
4. The trial court erred in awarding ap-pellee a credit of 50% of the interest that accrued on the “real estate loan” during the existence of the community.
5. The trial court erred in failing to credit appellant with improvements made to his separate residence prior to the existence of the community.
FACTS
Johnny R. Stubbs was employed by the Baton Rouge Fire Department on Novem *893 ber 16, 1966, and began at that time to participate in their retirement program. Mr. Stubbs married Lois T. Stubbs on January 2, 1982. Mr. Stubbs entered the City-Parish Retirement System Drop Program on December 1, 1987, and continued in that program until February 28, 1990. Meanwhile, Mr. and Mrs. Stubbs were divorced and their community of acquets and gains was dissolved effective November 14, 1989.
The trial court listed the following stipulations which were made by the parties at trial:
1. Lois T. Stubbs is entitled to 14.05% of Johnny R. Stubbs [sic] on going [sic] monthly retirement benefit. (Based on the Sims formula, the defendant had 21 years service in the retirement system and the parties were married for 5.9 of those years).
2. Johnny R. Stubbs entered the DROP program on December 1, 1987, and his participation ended on February 28,1990.
3. From his entry into the DROP program on December 1, 1987 through the termination of the community on November 16,1989, $41,713.42 was accumulated in the DROP fund, of which $4,319.12 was interest.
4. From the termination of the community on November 16, 1989 through the end of Johnny R. Stubbs [sic] participation in the DROP program, additional funds accumulated in the fund in the amount of $5,878.00 in both principal and interest.
5. Lois T. Stubbs is entitled to 14.05% of the $5,878.00 accumulated in the DROP fund between November 16, 1989 and February 28, 1990.
6. Lois T. Stubbs is entitled to the sum of $447.02 representing her portion of two retirement checks that Johnny R. Stubbs received prior to filing of these proceedings.
7. Johnny R. Stubbs withdrew $32,-000.00 from the DROP program on March 1,1990, from which sum $6,400.00 was withheld as taxes, and Mr. Stubbs received a check for the net amount of $25,600.00.
8. [The former] matrimonial domicile which is the separate property of Johnny R. Stubbs has an appraised valuation of $23,000.00.
9. Johnny R. Stubbs purchased this immovable property on December 12, 1978 for the sum of $9,100.00. A mortgage was placed on this property for $8,100.00, which mortgage had monthly payments of $146.73.
10. The balance in the DROP fund as of the date of trial was $16,447.78, plus $107.90 additional interest which would be due on November 30, 1990.
11. The applicable interest rates on the DROP funds were 10.5% in 1987, 9% in 1988 and 1989, and 8.6% in 1990.
12. As of March 1, 1990, before the $32,000.00 withdrawal from the DROP fund by Johnny R. Stubbs, the balance in that fund was $47,591.72.
13. The parties has [sic] agreed as to the division of all personal, movable property, and each will remain in possession of those items of property which they presently have. Johnny R. Stubbs is to maintain the payments on all community obligations. Johnny R. Stubbs paid the Livingston Parish Police July [sic] $225.93, and is entitled to reimbursement of one-half of that amount from Lois T. Stubbs.
14. Out of the $32,000.00 withdrawn from the DROP funds, Johnny R. Stubbs paid on March 1, 1990, $339.61 to pay-off one signature loan at the credit union, $581.45 to pay-off another loan at the credit union, and $14,482.79 on the “cosigner loan” with the credit union.
15. The parties were married January 2, 1982, and [the] community terminated effective November 16,1989 with the filing of a suit for legal separation.
DROP FUNDS
Appellant argues on appeal that the trial court erred in classifying the funds deposited into his DROP account during the existence of the marriage as civil fruits, and dividing them between the parties equally. Appellant contends his former wife is entitled only to the same percent *894 age, based on years of marriage, as she will receive of his regular retirement benefits, i.e. 14.05%. The provisions of the City-Parish Retirement System Drop Program were introduced into evidence and provide, in pertinent part, as follows:
MEMBERS, CITY-PARISH RETIREMENT SYSTEM
SECTION 20. DEFERRED RETIREMENT OPTION PLAN.
(a) In lieu of terminating employment and accepting a service retirement allowance under sections 264(a), 265(a), or 266(a), any member of this system who has not less than twenty-five years and not more than thirty years of creditable service and who is eligible to receive a service retirement allowance may elect to participate in the deferred retirement option plan and defer the receipt of benefits in accordance with the provisions of this section.
(b) For purposes of this section, creditable service shall not include service credit reciprocally recognized under Louisiana R.S. 42:697.
(c) The election to participate in the plan shall be exercised prior to the attainment of thirty years of creditable service or such right of election shall be forfeited.
(d) The duration of participation in the plan shall be specified, and shall not exceed a number of years which when added to the number of years of all creditable service which the member has in the retirement system, exceeds a total of thirty-two years. In any event the total participation in the plan shall not exceed five years.
(e) A member may participate in the plan only once and after commencement in the plan he shall never have the right to be a contributing member of the retirement system again.
(f) Upon the effective date of the commencement of participation in the plan, membership in the system shall terminate and neither employee nor employer contributions shall be payable. For purposes of this section, compensation and creditable service shall remain as they existed on the effective date of commencement of participation in the plan. The monthly retirement benefits that would have been payable, had the member elected to cease employment and receive a service retirement allowance, shall be paid into the deferred retirement option plan account. These deferred benefits shall earn interest as provided in subsection (g). Upon termination of employment, deferred benefits shall be payable as provided by subsection (i).
(g) The deferred retirement option plan account shall earn interest at a rate set annually by the board of trustees. Such interest shall be weighted and credited on a pro rata basis by the board of trustees to each individual account balance in the account on an annual basis.
(h) The deferred retirement option plan account shall not be subject to any fees, charges, etc., of any kind for any purpose.
(i) Upon termination of employment at the end of the specified period of participation, a participant in the program shall receive, at his option, a lump sum payment from the account equal to the payments to the account, plus earned interest, or a true annuity based upon his account, or he may elect any other method of payment if approved by the Board of Trustees. The monthly benefits that were being paid into the fund during the period of participation shall begin being paid to the retiree.
(j) If a participant dies during the period of participation in the program, a lump sum payment equal to his account balance shall be paid to his named beneficiary, or if none, to his estate; in addition, normal survivor benefits payable to survivors of retirees shall be payable. If a participant terminates employment prior to the end of the specified period of participation he shall receive, at his option, a lump sum payment from the account equal to the payments to the account, plus earned interest, or a true annuity *895 based upon his account balance, or he may elect any other method of payment if approved by the board of trustees. The monthly benefits that were paid into the fund during the period of participation shall begin being paid to the retiree.
(k) If employment is not terminated at the end of the period specified for participation, payments into the account shall cease and no further interest shall be earned or credited to the individual account in the fund for the duration of employment past the end of the period specified for participation. Payment from the account shall not be made until employment is terminated; nor shall the monthly benefits being paid into the fund during the period of participation be payable to the individual until he terminates employment. Upon termination of employment a member shall receive at his option, a lump sum payment from the account equal to the payments to the account, plus interest earned by the individual account, or a true annuity based upon his account balance, or he may elect any other method of payment if approved by the Board of Trustees.
(il )(1) If an employee becomes disabled after the period of participation in the plan but while still an employee and his employment is terminated because he is disabled, he shall receive, at his option, a lump sum payment from the account equal to the payments to the account, plus earned interest, or a true annuity based upon his account balance, or he may elect any other method of payment if approved by the Board of Trustees. The monthly benefits that were paid into the fund during the period of participation shall begin being paid to the retiree.
(2) If an employee dies after the period of participation in the plan but while still an employee, a lump sum payment equal to his account balance shall be paid to his named beneficiary, or if none, to his estate; in addition, normal survivor benefits payable to survivors of retirees shall be payable.
An examination of the nature of the DROP program funds is necessary to a resolution of this matter. In the present case, the trial judge has classified “those funds deposited in the DROP account from the commencement of participation in that plan by Johnny R. Stubbs through the effective date of the termination” as “civil fruits attributable to the established retirement account.” Fruits are defined by La. C.C. art. 551 as follows:
Fruits are things that are produced by or derived from another thing without diminution of its substance.
There are two kinds of fruits; natural fruits and civil fruits.
Natural fruits are products of the earth or of animals.
Civil fruits are revenues derived from a thing by operation of law or by reason of a juridical act, such as rentals, interest, and certain corporate distributions.
We believe the trial court erred in classifying the DROP funds as fruits of the “retirement account”. The “retirement account” herein considered consisted only of the right to receive retirement benefits, thus, the “retirement account” cannot be a separate “thing” from the retirement benefits to be received.
It is clear from a reading of the Deferred Retirement Option Plan that the DROP funds are merely retirement benefits paid to an employee in advance of his actual retirement. As set forth in the Deferred Retirement Option Plan, “[t]he monthly retirement benefits that would have been payable, had the member elected to cease employment and receive a service retirement allowance, shall be paid into the deferred retirement option plan account.” Furthermore the Plan provides that after termination of an employee’s participation in the DROP program, “[t]he monthly benefits that were being paid into the fund during the period of participation shall begin being paid to the retiree.”[1]
*896 Therefore, we must conclude that a division of DROP funds for purposes of a community property settlement must be made according to the Sims formula applied to other retirement benefits in the manner provided by Hare v. Hodgins, 586 So.2d 118 (La.1991), and Sims v. Sims, 358 So.2d 919 (La.1978). Consequently, Lois Stubbs is entitled to collect 14.05% of the $41,713.42 in DROP funds deposited during the existence of the marriage.
“CO-SIGNER LOAN”
At the time of the parties’ marriage, Mr. Stubbs had a pre-existing separate obligation to his credit union of $9,496.47, referred to herein as his “co-signer loan.” During the existence of the marriage, eight additional loans were obtained from the credit union for community purposes and added to the balance of the pre-existing loan. When the community terminated, there was a balance of $14,482.79 owed on this loan. The trial court determined that the community was due reimbursement for the principal amount of $9,496.47 and interest thereon of $6,449.44. Appellant, while not contesting the method of calculation of the interest, contends on appeal that the trial court erred in its mathematical calculation of this interest. We agree that there were some errors in calculation and in the factual data.
The trial court reasoned as follows:
Each time this loan was refinanced such that Mr. Stubbs borrowed back up to the lending limit for this type of loan, additional proceeds were derived. These new proceeds were actually utilized for community purposes, and further, in effect, replaced the old balance, being a separate debt, with new debt which was a community indebtedness. Accordingly, the amount of interest attributable to the separate portion of this indebtedness should decrease with each new draw, and interest should be charged only on the balance of the total debt which would represent the separate indebtedness.
Applying the correct information and calculations, the following result is reached:
DATE ADDITIONAL BALANCE OF PERIOD LOAN SEPARATE DEBT OUTSTANDING INTEREST
1-02-82 $9,496.47 2.5 mos @ 15%[2] $ 296.76
3-18-82 $ 981.16 8,515.31 9.5 mos @ 15% 1,011.19
I-06-83 1,363.66 [3] 7,151.65 10.5 mos @ 15% 938.65
II-30-83 1,528.32 5,623.33 5.5 mos @ 15% 386.60
5-14-84 593.75[4] 5,029.94 17.0 mos @ 18% 1,282.54
9-20-85 1,440.64[5] 3,588.94 3.3 mos @ 18% 177.67
23.5 mos @ 17% 1,194.94
12-18-87 2,892.25 696.69 5 mos @ 14% 40.64
TOTAL INTEREST $5,328.99
*897 Thus, the total of the pre-existing loan balance and interest would be $14,825.46.
Appellant also contends that he should have received a credit for the amount he paid in retiring the community balance on this loan after the termination of the community, $14,482.79. However, credit was given by the trial court for these amounts as stated in the “Recapitulation” section of the trial court reasons: “LESS REIMBURSEMENTS DUE JOHNNY STUBBS ... Pay-off of community debts (community portion of ‘co-signer loan’) ... $14,-482.79”.
REAL ESTATE LOAN
The home in which the parties made their matrimonial domicile was the separate property of Mr. Stubbs; he acquired the house and lot in 1978 for a purchase price of $9,100.00. In 1983, the balance remaining on the portion of the purchase price that was financed, $5,751.96, was refinanced and included in a new loan totaling $14,000.00. Thereafter in 1986, an additional amount was borrowed and added onto the 1983 loan, increasing the balance to $24,000.00. Of these new proceeds, $3,300.00 was spent improving Mr. Stubbs’s separate property. On termination of the marriage, the balance of this loan was $21,690.85. The trial court assigned this debt to Mr. Stubbs, and found that after subtracting the amounts spent on Mr. Stubbs’s separate property, $9,051.96, a community debt of $12,638.89 remained. However, the judge did not give Mr. Stubbs credit for the assumption of this indebtedness because he found that the separate property of Mr. Stubbs had increased in value from $9,100.00 to $23,-000.00; therefore, the court offset the amount due Mr. Stubbs for payment of a community debt with the amount due Mrs. Stubbs under La.C.C. art. 2368 for the increase in Mr. Stubbs’s separate property attributable to common labor.
The testimony of the parties established that during their marriage, the roof of the house was expanded, a porch, living room and garage were added, paneling was put in the house, and carpeting was installed. Mrs. Stubbs testified the labor required by these improvements was shared by the parties. Under these circumstances, we are unable to say the trial court erred in finding the increase in value of the home to be attributable to the common labor of the parties. Therefore, we find no merit in appellant’s contention that the appreciation in value of the house did not occur solely during the existence of the community; the factual findings of the trial court cannot be disturbed absent manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Appellant also contends that a credit under La.C.C. 2366 for community funds expended to improve separate property and an award under La.C.C. art. 2368 for an increase in value of separate property attributable to common labor are mutually exclusive. Appellant cites no authority for this proposition and we are aware of none. Clearly, the individual labor of the parties is a distinguishable and separate thing from the materials used in their labor purchased with community funds. Accordingly, we find no error in the separate consideration given by the trial court of these items.
For the reasons assigned herein, the judgment of the trial court is amended in accordance with the foregoing; all costs of this appeal to be borne by the parties equally.
AMENDED; AFFIRMED AS AMENDED.

. Thus, a simple description of the City-Parish DROP program would be the following. An employee eligible for retirement can continue to work but cease making payments to the retire *896 ment system for a specified period of time before actual retirement. The employee is "paid” his retirement benefits indirectly; the benefits being deposited into a special interest-bearing account (the DROP account) which can only be withdrawn after actual retirement. The employee’s retirement benefit is calculated upon entry into the drop program, and years worked thereafter do not count toward an employee’s "years of service”.

.The trial court calculations stated the interest during this time was 18%; however, the credit union records clearly show that 15% interest accrued on this account from January of 1982 through May of 1984.

. Testimony showed this to be the correct amount although the trial court used the figure of $1,363.65.

. Although the actual amount of the new loan on this date was $5,593.75, a new credit limit had been given to Mr. Stubbs (his old limit was raised from $10,000 to $15,000); therefore, the trial court did not use the $5,000 of new funds in his calculations.

. The figure in the trial court calculations was erroneously listed as $1,440.69.